IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>CHALMER DETLING, II<br>A/K/A CHUCK DETLING | Criminal Action No.<br><br>1:18-cr-00309-LMM-LTW |

**Government's Response to Defendant's Motion for New Trial**

The United States of America, by Kurt R. Erskine, United States Attorney, and Alex R. Sistla and Samir Kaushal, Assistant United States Attorneys for the Northern District of Georgia, files this response to Defendant Chalmer Detling's Motion for New Trial (R. 170). For the reasons below, the Court should deny his motion.

## Background

### A. Detling's Trial

On November 1, 2021, after an eight-day trial, a jury convicted Detling of four counts of wire fraud, in violation of 18 U.S.C. § 1343, and five counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. (R. 154, Jury Verdict.) At trial, the government presented overwhelming evidence that Detling executed a multi-year scheme in which he defrauded financing companies by falsely claiming his law firm's clients needed a form of litigation financing known as "litigation advances," when, in fact, they did not. Detling executed this scheme, in

part, by using his clients' personal identifying information to obtain the litigation advances. After obtaining the funding from the financing companies, Detling did not use the money for its intended use—to provide to his clients—but rather used the money for himself and his firm. To prove its case, the government presented nearly two dozen witnesses, including individuals from the defrauded financing companies, twelve of Detling's victim-clients, several of Detling's former colleagues, and the deputy general counsel of the State Bar of Georgia, as well as over 400 exhibits.

### 1. The Financing Company Witnesses

Four witnesses from the defrauded financing companies testified. Dr. Howard Golden and Caitlin Wade Caballero testified on behalf of Capital Financing, and Josh Schwadron and Hugh Brammer testified on behalf of the Mighty Financing entities ("Mighty"). Each of these witnesses testified—and were corroborated by voluminous email correspondence and business records—that they dealt exclusively with Detling on the fraudulent litigation advances and had they known that his clients neither authorized the advances nor received the funds, they would never would have approved them.[1] For Capital Financing,

---

[1] For Capital Financing, the relevant exhibits are GX-1 through GX-9, GX-11, GX-12, GX-14 through GX-18, GX-21, GX-23, GX-24 through GX-26, GX-28, GX-31 through GX-35, GX-37 through GX-40, GX-42 through GX-47, GX-49, GX-50, GX-51, GX-54, GX-57, GX-60 through GX-64, GX-67 through GX-72, GX-74 through GX-76, GX-78 through

Detling was the exclusive point of contact—he was listed as the "attorney" on the applications for the fraudulent litigation advances, he executed the contracts,[2] and he picked up and endorsed each of the fraudulently obtained checks.[3] Caballero and Golden testified that Capital Financing communicated exclusively with Detling about the status of repayment.[4] And Detling himself stipulated to many of these facts in proceedings before the Georgia Bar.[5] The evidence showed that Detling was able to conceal his fraud from Capital Financing, in part, by exploiting his friendship with Golden.

As for Mighty, Schwadron's and Brammer's testimony mirrored that of Caballero and Golden. They both detailed communicating exclusively

---

GX-82, GX-83, GX-98 through GX-109, GX-131, GX-136, GX-427, GX-428, GX-429, For Mighty, the relevant exhibits are GX-138GX-288, GX-336GX-339, GX-346, GX-400, GX-406, and GX-441.

[2] *See, e.g.*, GX-43 (Capital Financing contract for S.K.); GX-47 (Capital Financing contract for T.M.); GX-54 (Capital Financing contract for V.M.); GX-57 (Capital Financing contract for B.P.); GX-60 (Capital Financing contract for B.P.); GX-70 (Capital Financing contract for K.P.); GX-76 (Capital Financing contract for A.U.); GX-81 (Capital Financing contract for L.R.W.).

[3] *See* GX-101 through GX-109, GX-131.

[4] *See, e.g.*, GX-14 through GX-18 (email correspondence between C. Wade and C. Detling.)

[5] *See* GX-379 (Consolidated Pretrial Order State Disciplinary Board Docket. No. 6772); GX-386 (Excerpts from June 29, 2016 Proceedings before Special Master (Vol I) in State Disciplinary Board Dockets No. 6640, 6772, 6804).

with Detling about the fraudulent litigation advances. And though Schwadron and Brammer mainly communicated with Detling via email, they both spoke with him on the phone and even met with him in person on a few occasions.[6] Both men testified that they relied on Detling's representations as to why his clients needed litigation advances and in deciding whether and how much funding to provide. The government introduced hundreds of emails between Detling and Schwadron, Brammer, or other Mighty employees in this respect. For example, the government presented evidence that Detling repeatedly made false representations to Mighty ranging from the reasons his clients needed litigation advances, to the nature of their injuries, to even the fact that he had met with them.[7] The government also presented evidence that Detling signed each of the Mighty agreements[8]

---

[6] *See, e.g.*, GX-231 (Detling visit to New York City); GX-253 (Schwadron visit to Atlanta and meeting Detling and his wife).

[7] *See, e.g.*, GX-254 (May 7, 2015 email from C. Detling to H. Brammer containing false representations regarding victim-client B.C.); GX-257 (May 27, 2015 email from C. Detling to H. Brammer and J. Schwadron containing false representations regarding victim-clients S.L and W.L.); GX-264 (Oct. 30, 2015 email from Detling to Mighty containing false representations regarding victim-client W.G.).

[8] The contracts corresponding to the charged counts in the superseding Indictment are GX 161 (Mighty Financing contract for B.P.), GX-165 (Mighty Financing contract for K.P), GX-172 (Mighty Financing contract for H.M.), GX-178 (Mighty Financing contract for W.G.), and GX-336 (Mighty Financing contract for V.M.). The government also presented evidence and testimony regarding other

and provided the wiring instructions for where to send the fraudulently obtained funds.[9] To stave off detection, Detling provided semi-fictitious case updates to Schwadron,[10] falsely tried to blame one of his former colleagues, Mackenzie Cole, for the fraud,[11] or generally stalled and delayed.[12] The government presented evidence that after Mighty learned of Detling's fraud, he tried for months to make "payoffs," ultimately reaching an agreement with Mighty to "release" his former clients from any liability.[13]

### 2. The Victim-Clients

The jury heard from twelve victim-clients, including the five whose identities underlie the charges in the superseding indictment. Every victim-client uniformly testified that they never signed or authorized

---

fraudulently obtained litigation advances from Mighty for uncharged victim-clients. *See* GX-146–, GX-147, GX-148, GX-150, GX-168, GX-161, GX-338, GX-339 (contracts for uncharged testifying victim-clients B.C., K.J., M.S.K., S.L./W.L, T.M., and L.R.W.).

[9] *See* GX-138 (Affinity wiring information); GX-145 & GX-185 (Georgia Commerce wiring information); GX-186 & GX-187 (SunTrust wiring information).

[10] *See, e.g.*, GX-171, GX-204, GX-266.

[11] *See, e.g.*, GX-272.

[12] *See, e.g.*, GX-271, GX-273-GX-282.

[13] *See* GX-400 (Forbearance and assignment agreement). The evidence at trial showed that this "release" had no practical effect because Mighty never intended to sue any of Detling's clients because they never received any of the funding.

any of the financing contracts. Nor—with one exception—would they have authorized Detling to obtain a litigation advance if he asked.[14] To the contrary, several of the victim-clients (*e.g.¸* M.S.K., D.M. on behalf of T.M.) testified that they expressly told Detling that they did not want a litigation advance. And several of the client-victims (*e.g.*, K.P. and A.U.) testified that they never had any substantive discussions with Detling about their cases, let alone discussions about litigation advances. Each of the victim-clients likewise testified that they never received any of the funds from the financing companies. The government's final witness, FBI Special Agent Antoinette Ferrari, confirmed this was the case by explaining to the jury that she had traced the fraudulently obtained litigation advances and found that none of them went to any of Detling's clients.

### 3. The Bank Accounts

The government presented overwhelming evidence that Detling controlled the bank accounts into which the fraudulent litigation advances were directed. The government introduced bank records showing that Detling was the sole signatory for two of the accounts— the Affinity Bank account ending in x9635[15] and the Georgia

---

[14] Victim-client H.M. testified that she had obtained one legitimate litigation advance from Capital Financing.

[15] *See* GX-331, GX-332 (Affinity signature cards).

Commerce Bank account ending in x4219[16]—that received thirteen fraudulent litigation advances, and one of two signatories on the SunTrust Bank account ending in x0526 account, into which most of the fraudulent litigation advances were wired or deposited.[17] Detling's former colleagues, Aimee Ingram and Mackenzie Cole, testified they did not have access to the Affinity or Georgia Commerce accounts and while they were either a signatory or had access to the SunTrust account, Detling was the one who controlled that account as well. In addition to his former colleagues' testimony, the government further proved Detling controlled the SunTrust x0526 account by introducing: (i) an affidavit Detling filed with the Georgia Bar in which he admitted to controlling the account and stated plainly that Mackenzie Cole did not;[18] (ii) months of correspondence between him and the Georgia Bar about the account being overdrawn;[19] and (iii) admissions he made when deposed by the Georgia Bar.[20] The government also presented an exhibit summarizing the approximately 50 fraudulent litigation advances, totaling more than $400,000, that Detling had obtained between October 9, 2014 and January 1, 2016. Those funds were

---

[16] *See* GX-84, GX-85 (Georgia Commerce signature cards).

[17] *See* GX-93 (SunTrust signature card).

[18] *See* GX-350.

[19] *See* GX-341 through GX-345; GX-434 through GX-439.

[20] *See* GX-386.

directed into the three bank accounts: Affinity x9635 received six fraudulent wires, Georgia Commerce x4219 received seven fraudulent wires, and SunTrust x0526 received thirty fraudulent wires and deposits.[21]

### 4. Detling's Defense

Detling's theory of defense varied over the course of the trial. At different points, Detling offered that: (i) he could not have possibly committed the fraud because he was "absent" from the firm; (ii) his former colleagues—Aimee Ingram and Mackenzie Cole—were to blame because they were motivated to see the firm succeed; (iii) someone hacked his email and was responsible; or (iv) he acted in good faith by supposedly relying on information provided by colleagues or perhaps the clients' implicit authorization to obtain the litigation advances.

### B. The Jury Instructions

The parties filed proposed jury instructions before the trial began. (R. 136, Govt. Proposed Jury Instructions; R. 137, Detling's Proposed Jury Instructions.) The government's proposal did not include the two instructions at issue here—requests to instruct the jury on deliberate ignorance and aiding and abetting. Detling's proposed instructions also did not include either of these instructions but included a proposed

---

[21] *See* GX-445. The evidence at trial showed that Mighty would sometimes combine multiple litigationadvances into a single wire, consequently the number of wires is less than the number of fraudulent litigation advances Detling obtained.

good faith instruction. (R. 137, Detling's Proposed Jury Instructions at 12.)

On October 28, 2021, before the government had concluded its case-in-chief, the Court held its first charge conference. (R. 157, Minute Entry.) During the charge conference, the government objected to Detling's proposed good faith instruction. (R. 166, Oct. 28, 2021 Charge Conference at 9:18–20 ("At this point [we] don't believe there's an evidentiary basis to support a good faith instruction.").)[22] Detling argued that a good faith instruction was appropriate because he claimed a jury could conclude that Detling relied on his colleagues in applying for the litigation advances under the mistaken impression that the clients had authorized him to do so (by allegedly telling his colleagues they wanted litigation advances). (*Id.* at 10:12–11:9; 12:4–9; 13:4–13.) Without pointing to anything in the record, Detling argued:

> Well, if—we say it could be a mistaken belief if
> [Mackenzie Cole and Aimee Ingram] did and
> told Mr. Detling falsely that these clients want
> these advances. And if he operated on that
> mistaken belief in communicating with the
> funding companies and to the extent he picked
> up checks or deposited checks into the IOLTA
> account for client funds, he could have both
> addressed Mr. Schwadron and Mr. Golden with
> the belief these clients wanted that, he had
> access to this files, he's just describing what he

---

[22] Citations to transcripts list the docket entry, the beginning page and line number and the ending page and line number.

9

> thinks the injuries are and he's being fed a lie
> by Ms. Ingram and Ms. Cole.

(*Id.* at 13:4–13.)

The government responded:

> There's absolutely no evidence of that . . .
> [f]irst, of all, the defense [is] suggesting . . . that
> Mr. Detling is now admitting both that he
> applied for an obtained the loans, sent all those
> e-mails, picked up all the checks. That's not
> their defense. Their defense is somebody else
> did it. There is no evidence that Mr. Detling
> relied on Ms. Cole and Ms. Ingram telling him
> that clients X, Y, and Z wanted these loans,
> then he went ahead and applied for the loans
> and thought that the money would then
> appropriately be disbursed to the clients. . . .
> [W]hat underlies a good faith defense is the
> defendant first admitting they did the act and
> the case is ultimately whether they acted with
> an intent to defraud. . . . The Defendant hasn't
> admitted he's done the underlying act, so a
> good faith defense is just inappropriate . . . as
> the evidence stands now.

(*Id.* at 13:15–14:10.) The Court deferred ruling on the government's

objection, noting that it first wished to hear the rest of the evidence,

especially the cross examination of Cole. (*Id.* at 14:11–17.)

The next day, October 29, 2021, the government rested, and the

Court orally denied Detling's Rule 29 motion for judgment of acquittal.

(R. 157.) The Court then held a second charge conference during which

Detling's "theory of the defense" instruction was discussed. (*Id.*; R. 170,

Mot. for New Trial at 4.) The Court declined to give Detling's requested

"theory of defense" but afforded him an opportunity to brief the issue. (*Id.*) On Saturday, October 30, 2021, Detling filed a brief in support of his "theory of defense" instruction. (R. 150, Theory of Def. Br.) Without citing any authority, Detling wanted the jury instructed that it "must acquit based on acts committed by another person." (*Id.* at 4.) The government filed its response the next day. (R. 151, Govt. Opp. to Theory of Def.)

The government explained that Detling had offered no authority to support his proposed theory (*id.* at 1–3) and requested—if the Court were to provide Detling's proposed good faith instruction—that the jury be instructed on deliberate ignorance as well. (*Id.* at 6–8.) The government further requested the Court to instruct the jury on "aiding and abetting" in anticipation of Detling's closing argument. (*Id.* at 8 (requesting the Court instruct the jury on aiding and abetting using the Eleventh Circuit Pattern Jury Instructions).) The government was concerned, based on Detling's repeated claims that any involvement of another individual would require acquitting Detling, that Detling would argue to the jury—misleadingly and incorrectly—that he should be acquitted merely because *someone else* performed a relevant act, regardless of if he directed it or was otherwise criminally culpable for the act under the law.

On the morning of November 1, 2021, the Court held a third charge conference. (R. 158.). The Court explained that it was providing Detling

an opportunity to respond to the government's objections and
additional proposed instructions. (R. 167, Nov. 1, 2021 Charge
Conference at 7:13; *id.* at 8:23–25.) Detling argued that the aiding and
abetting instruction was improper because the government had not
"identified someone in addition to the principal . . . some sort of other
wrongdoer." (*Id.* at 9:20–22.) The government explained, in response,
that Detling's "own arguments for why they think other folks were
involved are the very reasons why aiding and abetting should be
included as an instruction[.]" (*Id.* at 13:12–15.) As for the deliberate
ignorance instruction, Detling argued it was not appropriate because
"it's a perfectly reasonable thing [for Detling] to rely on people, one of
which described themselves as a managing partner of the firm or a
bookkeeper or other people in the firm." (*Id.* at 12:4–7.)

    The Court rejected Detling's arguments. It refused to give his theory
of defense because "it was an inaccurate statement of the law" (*id.* at
15:18–19) and concluded that the aiding and abetting instruction was
appropriate because "the Eleventh Circuit case law is clear on this."
(*Id.* at 16:17–18.) The Court also agreed to instruct the jury on
deliberate ignorance but omitted the pattern instruction's example. (*Id.*
at 14:24–15:6.) When offered an opportunity to raise any other
concerns, Detling asked the Court to reconsider including a portion of
the "theory of defense" language that the Court itself had drafted in
order to "counterbalance . . . if the government is going to be allowed

. . . [to] argue aiding and abetting." (*Id.* at 17:25–18:18.) The Court rejected Detling's request—reiterating that the aiding and abetting instruction was appropriate given "the way the evidence came in"—and offered him another opportunity to raise any issues. (*Id.* at 18:19–19:21.) Detling had no further objections. (*Id.* at 19:22.)

The parties thereafter presented closing arguments, and Detling was convicted on all counts that afternoon. (R. 154, Jury Verdict.)

On December 7, 2021, Detling filed a motion for new trial. (R. 170, Mot. for New Trial.) He argues that the Court erred by instructing the jury on deliberate ignorance and aiding and abetting. (*Id.* at 7–16.) On December 14, 2021, the government obtained a two-week extension to file its response (R. 173), and now files its response in opposition.

## Argument

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Although "motions for a new trial are disfavored," *United States v. Williams*, 146 F. App'x 425, 434 (11th Cir. 2005), the "interest of justice" standard is broad, and the trial court is vested with substantial discretion in determining whether to grant such a motion. *See, e.g.*, *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) (holding that "interest of justice" standard is broad and "not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous").

13

Because the Court did not err by instructing the jury as to either deliberate ignorance or aiding and abetting, Detling's motion should be denied. But even if one or both instructions were erroneous, any such errors were harmless, and Detling cannot demonstrate that it is in the "interest of justice" to grant a new trial given the overwhelming evidence that supported the jury's verdicts.

## A. The Court correctly instructed the jury on deliberate ignorance.

The Court properly instructed the jury on deliberate ignorance. The "instruction is warranted 'only when . . . the facts . . . support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.'" *United States v. Santos*, 397 F. App'x 583, 590 (11th Cir. 2010) (quoting *United States v. Rivera*, 944 F.3d 1563, 1571 (11th Cir. 1991)) (internal quotation marks omitted). Although the "district court should not instruct the jury on 'deliberate ignorance' when the relevant evidence points only to actual knowledge, rather than deliberate avoidance[,]" *Rivera*, 944 F.2d at 1571, "if there is evidence in the record to support both actual knowledge and deliberate ignorance, then both instructions may be given." *United States v. Jeri*, 869 F.3d 1247, 1268 (11th Cir. 2017) (citing *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993)).

14

At trial, Detling offered various defenses, including that he purportedly relied in good faith on others—especially Cole and Ingram—for information relating to the litigation advances. (R. 165, Closing Arg. Tr. at 54:25-55:7.)[23] He also suggested he could have acted

---

[23] During closing, defense counsel argued that Cole and Ingram were responsible, and not Detling:

Now, the government may try to tell you that even if you think Mackenzie Cole or Aimie Ingram were involved in this, that doesn't mean you have to find Mr. Detling not guilty. But when they stood before you in opening, they never gave you any hint that they thought either of those people were involved and in fact

in good faith because the clients allegedly authorized him to obtain litigation financing under the terms of his firm's engagement letters. (*Id.* at 29:24–30:13.) On the other hand, Detling simultaneously argued that maybe someone had executed the scheme because they could have potentially accessed his email account. (*Id.* at 45:13–46:8.) Or that Cole and Ingram actually executed the entire scheme. (*Id.* at 54:18–24.)

---

they called them as their witnesses who they expected you to believe. But you were here. You saw their case blow up with those two witnesses. You saw -- you saw it with Aimie Ingram's lies and you saw it when she admitted that there were transactions that were not authorized by Mr. Detling that bit benefited her. And you saw it when Mackenzie Cole was forced to go through each and every one of the transactions that she would have been able to see while still pretending that she thought nothing was wrong. We're not suggesting to you that Mr. Detling knowingly assisted Ms. Ingram or Ms. Cole in a fraud scheme, but if you have any reason to believe that Ms. Cole and Ms. Ingram may have done this together, the same way that they planned to run the down payment through the firm's accounts without Mr. Detling's knowledge, then that is a reasonable doubt that should cause you to acquit. If you have any reason to believe that the two of them may have fed information that he, Mr. Detling, in good faith passed on to the funding companies about the client wanting the advances, then that is a reasonable doubt that should cause you to acquit. If you have reason to believe that they may have moved money out of the IOLTA account into the operating account without his knowledge, then that is a reasonable doubt that should cause you to acquit.

(R. 165, Closing Arg. Tr. at 54:4–55:7.)

Detling also argued at various points that he could not have committed the fraud because he was supposedly absent from the firm on account of his daughter's illness. (*See id.* at 41:24–42:6.)

Accordingly, the government requested the deliberate ignorance instruction based on Detling's apparent concession that he did apply for and obtain the fraudulent litigation advances, albeit purportedly under the guise of operating in "good faith." The Court correctly provided the instruction because the jury could infer—assuming it was true he relied on others—that Detling purposefully contrived to avoid learning that none of the clients had actually wanted the litigation advances. *See, e.g., United States v. Fernandez*, 553 F. App'x 927, 936–37 (11th Cir. 2014); *United States v. Magallon*, 984 F.3d 1263, 1286 (8th Cir. 2021) ("The '[deliberate ignorance] instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary.'") (quoting *United States v. Regan*, 940 F.2d 1134, 1136 (8th Cir. 1991)); *United States v. Gowder*, 841 F. App'x 770, 783 (6th Cir. 2020) ("Courts may give a deliberate-ignorance instruction if the defendant claims lack of knowledge and the facts and evidence support an inference of deliberate indifference.") (citation omitted); *see also United States v. Bryant*, 854 F. App'x 572, 574 (5th Cir. 2021) (citation omitted); *United States v. Underwood*, 845 F. App'x 239, 242 (4th Cir. 2021) (citation omitted).

Here, the evidence showed conclusively that Detling knew that litigation advances had been obtained and that he was the leader and primary decision-maker for the law firm. He was responsible for communicating with Capital Financing and Mighty about the advances.[24] And he had access to the bank accounts—several IOLTA accounts—that were used to receive the fraudulent litigation advances, rather than the clients' accounts.[25] But none of these advances were ever transferred from his firm's IOLTA accounts to the clients who supposedly needed them. Detling was also responsible for approving his client-victims' settlement statements, and these litigation advances—if legitimate—should have appeared on those statements. But the

---

[24] *See, e.g.,* GX-256 (May 21, 2015 email from C. Detling to H. Brammer ("And I'm the only one in the office who has the authority to sit down and talk to clients about financing options, so don't read anything into the fact that I haven't sent any apps your way in a few weeks.").

[25] The witnesses from the financing companies testified that it was unusual for the litigation advances to be deposited (or wired) directly into Detling's IOLTA accounts. In particular, Caballero testified that the clients, instead of their attorneys, typically picked up the litigation advance checks themselves from Capital Financing, and she could not recall any other attorney aside from Detling picking up the checks. This evidence thus shows either that Detling had actual knowledge that the advances had been fraudulently obtained or he was intentionally contriving to avoid learning why his clients were obtaining litigation advances but not the proceeds from those advances.

18

evidence showed they did not.[26]  The evidence also showed that while
Detling did not personally meet with every client-victim—other lawyers
were involved in their representations[27]—several had expressly told
him they did not want or need a litigation advance. [28] Taking all this
together, along with Detling's argument that he relied in good faith on
others at the law firm, gives rise to the inference that, even if Detling
did not have actual knowledge that the client-victims were not seeking
to obtain litigation advances, he purposefully contrived to avoid
learning that fact. *Cf. United States v. Alexander*, 857 F. App'x 592, 597
(11th Cir. 2021) (district court did not err by giving deliberate
ignorance instruction where defendant used "stolen identities as the
names of senders, rather than using his name or his co-conspirators'
names"); *Gowder*, 841 F.3d at 783 (deliberate ignorance instruction
appropriate where clinic owner "claimed a lack of knowledge" that it
was a pill mill but there was evidence of a health department
investigation, patients' abuse of drugs, and his prior involvement with
a co-defendant).

---

[26] *See, e.g.*, GX-272 (Mar. 3, 2016 email from C. Detling to J.
Schwadron); GX-276 (Mar. 16, 2016 email from C. Detling to J.
Schwadron); Testimony of A. Ingram.

[27] *E.g.*, testimony of client-victims K.P. and A.U.

[28] *E.g.*, testimony of client-victims M.S.K. and D.M. (on behalf of
client-victim T.M.).

Detling further claims that his "good faith" defense was somehow undercut by the deliberate ignorance instruction, but he does not explain how. (R. 170, Mot. for New Trial at 10.) And he has waived the ability to provide reasons later. *Cf. United States v. Kendricks*, No. 1:15-CR-400, 2016 U.S. Dist. LEXIS 142027, at *17–18 n.5 (N.D. Ga. Aug. 22, 2016) ("Arguments which are first raised in a reply brief are deemed waived.") (citing *United States v. House*, 684 F.3d 1173, 1210 (11th Cir. 2012)). At trial, Detling elicited testimony from witnesses, such as Schwadron and Brammer, who were unaffiliated with Detling's law firm, that they "did not know" how his firm operated or where Detling had purportedly received the information he relayed about clients or litigation advances. (R. 165, Closing Arg. Tr. at 39:19–24.) He extensively cross-examined Ingram and Cole about their access to client and banking information and Detling's need to rely on them because he was not daily at his firm. (*Id.* at 52:19–53:15 (arguing that Detling could have relied on information provided by Cole).) Detling further highlighted the "power of attorney" clauses in his firm's engagement letters to argue that his clients' implicitly authorized him to obtain litigation advances. (*Id.* at 29:24–30:13.) As such, his "good faith" presentation was not harmed by the instruction and the Court did not err in issuing the deliberate ignorance instruction.

Detling next argues, without legal authority, that instructing a jury on deliberate ignorance amounts to a constructive amendment. (R. 170,

Mot. for New Trial at 10.) [29] This argument fails. Instructing a jury how the government may prove that a defendant had the requisite knowledge does not broaden the possible bases of conviction. As shown in the jury instructions, the jury was still required to find each element of wire fraud and aggravated identity theft beyond a reasonable doubt, including that Detling acted knowingly. (R. 153, Detling Final Jury Instructions at 8–9 (wire fraud); 11 (aggravated identity theft)). *Compare United States v. Edwards*, 526 F.3d 747, 761 (11th Cir. 2008) ("As the jury instructions did not alter the *mens rea* element of the wire fraud offense, a constructive amendment did not occur.") *with United States v. Madden*, 733 F.3d 1314, 1317–18 (11th Cir. 2013) (indictment was constructively amended when jury instructed that it could convict a defendant if it found he carried a firearm "*during and in relation* to a drug trafficking offense," when the indictment charged the defendant only with possessing a firearm "*in furtherance of* . . . a drug trafficking crime" and using and carrying a firearm "during and in relation to a crime of violence") (emphasis added). [30]

---

[29] "A constructive 'amendment occurs when the essential elements of the offense are altered to broaden the possible bases for conviction beyond what is contained in the indictment.'" *United States v. Edwards*, 526 F.3d 747, 760 (11th Cir. 2008) (quoting *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990)) (alterations omitted).

[30] *See also, e.g., United States v. Vasquez*, 677 F.3d 685, 696 (5th Cir. 2012) ("The deliberate ignorance instruction does not lessen the government's burden to show, beyond a reasonable doubt, that the

Even if the Court erred—and it did not—by instructing the jury on deliberate ignorance, the Eleventh Circuit has "repeatedly held" that doing so "'is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge.'" *United States v. Wentt*, 828 F. App'x 526, 528 (11th Cir. 2020) (quoting *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008)). That was the case here. The Court properly instructed the jury as to actual knowledge (R. 153, Final Jury Instructions at 6), and the government introduced "sufficient evidence to support the actual-knowledge theory." *United States v. Ahrens*, 782 F. App'x 845, 849 (11th Cir. 2019) (citing *United States v. Stone*, 9 F.3d 934, 937, 940 (11th Cir. 1993)); *see also, e.g.*, *United States v. Pineda*, 843 F. App'x 174, 181 (11th Cir. 2021) (district court did not err by instructing the jury as to deliberate ignorance even though there was testimony that the defendant acted "with full knowledge of the fraud" and even if the court erred, it was harmless, because "there was sufficient proof that [the defendant] had actual knowledge of the fraud"); *United States v. Fernandez*, 553 F. App'x 927, 937 (11th Cir. 2014) ("But the absence or presence of evidence of deliberate ignorance 'does not matter' when 'the jury could have convicted on an alternative, sufficiently supported

---

knowledge elements of the crimes have been satisfied.") (quotation marks omitted).

theory of actual knowledge.") (quoting U*nited States v. Kennard*, 472 F.3d 851, 858 (11th Cir. 2006)).[31]

As detailed above, the government introduced overwhelming evidence from which the jury could have concluded that Detling acted with actual knowledge. The government's evidence proved, among other things, that Detling executed the fraudulent financing contracts, directly and extensively communicated with the financing companies (and was their exclusive contact), controlled the bank accounts in which the fraudulent funds were deposited or wired, and was even told by several clients that they did not need or want a litigation advance.

---

[31] Indeed, Detling's reliance on *Stone* is curious because there the Eleventh Circuit applied a harmless error analysis where the defendant argued that the jury had been improperly instructed on deliberate ignorance. *Stone*, 9 F.3d at 939–42. Detling suggests that *Stone* is distinguishable because in that case "the jury was instructed on the evidentiary basis which must be found before it can consider whether the defendant acted with deliberate ignorance." (R. 170, Mot. for New Trial at 9.) Detling does not cite any language from *Stone* to support this argument. Nor does it make much sense considering what *Stone* actually says. *Stone* explained, first, that it was uncontested that the deliberate ignorance instruction was correct as a matter of law, *Stone* 9 F.3d at 939, and second, because the jury is presumed to follow the law, "if there was insufficient evidence to prove deliberate ignorance beyond a reasonable doubt, there is no reason to believe that the jury convicted [the defendant] on a . . . theory for which there was insufficient evidence." *Id.* at 941–42. Although Detling objected to instructing the jury on deliberate ignorance, he did not argue that the Court's instruction—as given—improperly instructed the jury on the law. (R. 167, Nov. 1, 2021 Jury Charge Conference at 10:22–12:16.)

Finally, Detling argues for the first time in his motion that the Court erred by not giving a portion of the pattern instruction on deliberate ignorance. (R. 170, Detling Mot. for New Trial at 8.) Because Detling failed to object to the Court not providing this portion of the instruction—as opposed to objecting to the deliberate ignorance instruction in its entirety—the Court should review the failure to give this portion of the deliberate ignorance instruction for plain error. *See, e.g.*, *United States v. Iriele*, 977 F.3d 1155, 1177 (11th Cir. 2020) (noting that plain error applies to any unpreserved objections to jury instructions because Federal Rule of Criminal Procedure 30(d) requires a party to "inform the court of the specific objection and grounds for objection before the jury retires to deliberate"); *United States v. Puche*, 350 F.3d 1137, 1148 n. 5 (11th Cir. 2003) (noting that because defendants objected to the deliberate-ignorance instruction on different grounds on appeal, the plain-error standard of review applied); *United States v. Schlei*, 122 F.3d 944, 974 (11th Cir. 1997) ("Although Schlei objected to the deliberate ignorance instruction at trial, he did not raise this specific contention before the district court. 'In order to preserve an objection to jury instructions for appellate review, a party must object before the jury retires, stating distinctly the specific grounds for the objection.'") (quoting *United States v. Starke*, 62 F.3d 1374, 1380-81 (11th Cir.1995)); *United States v. Sirang*, 70 F.3d 588, 594 (11th Cir.

1994) (holding the objection must be specific enough to give a court an opportunity to correct errors before the case goes to the jury).[32]

To satisfy plain error, Detling must show "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Xavier*, 735 F. App'x 656, 659 (11th Cir. 2018) (citing *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013)).[33] Although the Court modified the pattern instruction by not providing the jury an example of deliberate ignorance, the instruction, when coupled with the remaining jury instructions, properly instructed the jury as to the elements it had to find with respect to wire fraud and aggravated identity theft. Importantly, the jury was instructed that the government must prove every fact beyond

---

[32] The government could not locate any cases from the Eleventh Circuit discussing the interplay between the standard of review applicable to Rule 33 motions and that to unobjected jury instruction. In other words, while the Court may grant a Rule 33 motion where the "interest of justice" so demands, it is unclear whether a defendant could meet that standard where he could not demonstrate plain error because he must show both that the error affected his substantial rights and seriously affected the fairness, integrity, or public reputation of the proceedings.

[33] As a formal matter, a party must establish the first three elements of plain error, before a court "may . . . exercise its discretion to notice a forfeited error, but only if [ ] the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007).

a reasonable doubt, and they could not find Detling guilty merely because of "negligence, carelessness, or foolishness." (R. 153, Jury Instructions at 8, 11); *see, e.g.*, *United States v. Jefferies*, 378 F. App'x 961, 963 (11th Cir. 2010) ("We examine jury instructions to determine if, taken as a whole, the jury was sufficiently instructed to understand the issues and was not misled.") (citing *United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001)).[34] And it is well-settled that the jury is presumed to follow the instructions. *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005) (citation omitted). But even if there was error here, it was not plain. Detling has identified no authority that the modified instruction—either taken alone or read as part of the jury instructions as a whole—would be obvious error.

Nor can Detling demonstrate that any error with the instruction—assuming there was some error—affected his substantial rights or seriously affected the fairness or integrity of his trial. For example, in *United States v. Watson*, 611 F. App'x 647 (11th Cir. 2015), the court of appeals held that even if the district court plainly erred in providing a deliberate ignorance instruction, the defendant could not "demonstrate

---

[34] Indeed, there could be little doubt that the government's burden was proof beyond a reasonable doubt. Detling stressed that point in his closing argument, mentioning the government's burden or "reasonable doubt" at least a dozen times in his closing argument. (R. 165, Closing Arg. Tr. at 27, 28, 29, 30, 36, 54, 55.) For its part, the government noted its burden prove Detling's guilt beyond a reasonable doubt at least four times. (*Id.* at 2, 3, 27, 56.)

that the error affected his 'substantial rights' [because] [i]n the 'ordinary case,' an error impacts a defendant's substantial rights when that error "affected the outcome of the district court proceedings." *Id.* at 662-663 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). In *Watson*, [a]ny error from the [deliberate ignorance] instruction had no effect on the proceedings because the evidence at trial supported a finding that [the defendant] actually knew that his passengers could not legally enter the United States." 611 F. App'x at 663; *see also Starke*, 62 F.3d at 1381. Likewise, here, the evidence at trial demonstrated that Detling knew his victim-clients neither applied for nor authorized Detling to obtain litigation advances on their behalf. As such, whether the Court plainly erred by instructing the jury on deliberate ignorance was inconsequential and had no affect on the outcome of Detling's trial.

Moreover, it is difficult to imagine any scenario where a defendant could show plain error under these circumstances given that the Eleventh Circuit has repeatedly held that even where the deliberate ignorance instruction was improperly given, *i.e.*, where no evidence supports it being given the jury, such an error is harmless where there is "sufficient evidence to support the actual-knowledge theory" *Ahrens*, 782 F. App'x at 849; *Fernandez*, 553 F. App'x at 937. Such is the case here, where the government presented overwhelming evidence from

which the jury could have concluded that Detling had "actual knowledge" of the fraud scheme.

### B. The aiding and abetting instruction was appropriate.

Detling's arguments against the aiding and abetting instruction fail because they are based on an incorrect understanding of the law.

First, contrary to Detling's repeated claims, aiding and abetting is a theory of criminal liability embedded in every count charged in an indictment and therefore there was no notice or constructive amendment issue:

> [T]here is no need to refer to aiding and abetting in the indictment because "[t]he aiding and abetting theory is not an essential element of the offense." *United States v. DePace*, 120 F.3d 233, 236 n.3 (11th Cir. 1997); *see also United States v. Broadwell*, 870 F.2d 594, 607 (11th Cir. 1989) (noting that a defendant "can be found guilty as an aider and abettor pursuant to 18 U.S.C. § 2 even though the indictment did not specifically charge him as an aider and abettor"). Instead, "it is merely a theory upon which criminal liability may be based," *United States v. Camacho*, 233 F.3d 1308, 1315 (11th Cir. 2000), and "an alternative charge in every count, whether explicit or implicit." *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980).

*United States v. Philpot*, 773 F. App'x 583, 590 (11th Cir. 2019). "An individual . . . may be indicted as a principal for the commission of a substantive crime and convicted upon evidence that he or she aided and abetted only." *United States v. Walser*, 3 F.3d 380, 388 (11th Cir. 1993). This is because "Title 18 U.S.C. § 2 . . . does not establish a separate

crime." *Id.* As such, "18 U.S.C. § 2 is an alternative charge in every count, whether explicit or implicit, and the rule is well-established . . . that one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted the commission of the offense." *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980) (stating that "18 U.S.C. § 2 does not define a crime[, but] simply makes punishable as a principal one who aids or abets the commission of a substantive crime") (internal quotation marks omitted)[35]; *United States v. Tucker*, 402 F. App'x 499, 502 (11th Cir. 2010) ("[U]nder our law, an individual indicted as a principal may be convicted on evidence showing that he aided and abetted the commission of the offense, regardless of whether the indictment included an aiding-and-abetting charge.").

Second, the evidence at trial supported inclusion of the instruction. At trial, evidence and testimony was presented that: (i) Ingram and Cole had access to the SunTrust Bank x0526 account;[36] (ii) this bank account was used as part of the fraud;[37] (iii) Cole had been given the title of "partner" by Detling; (iv) Detling did not personally interact with every victim-client; and (v) Cole and other lawyers at Detling's law

---

[35] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981.

[36] *See* GX-93 (SunTrust signature card).

[37] *See* GX-445 (Summary Chart).

firm were involved in representing some of the victim-clients. The evidence and testimony—including emails between Mighty and Detling and testimony from Golden, Caballero, Schwadron, and Brammer—also showed that Detling was solely responsible for interfacing with the financing companies. Ingram and Cole both testified on direct that they were not involved in the criminal scheme. And on cross-examination, Detling challenged their veracity. (*See* R. 170, Mot. for New Trial at 11.) The jury was left to evaluate the witnesses' veracity, which Detling attacked voraciously in closing. (*E.g.*, R. 165, Closing Arg. Tr. at 42:7–18, 44:2–3, 45:13–14, 46:9–47:2, 48:13–49:2.) Indeed, Detling's own defense (as described in his motion for new trial)—"that he relied in good faith upon the managing partner, Mackenzie Cole, and the office manager, Aimie Ingram, . . . regarding the desire of clients to obtain litigation advances" (R. 170, Mot. for New Trial at 11)—essentially concedes evidence of aiding and abetting liability, leaving only intent unproven. As such, there was some evidence and a view of the facts that the jury could reach—largely pushed by the defense—that Detling possibly worked with others to commit the fraud scheme. Although the government did not ultimately opt to do so, it would have been free to argue to the jury in closing (or on rebuttal) that even if Ingram and Cole were involved in the crimes, Detling could still be found guilty as a principal or under an aiding and abetting theory if the evidence supported that conclusion.

30

Third, this case is neither unique nor novel. In *United States v. Thomas*, 631 F. App'x 847 (11th Cir. 2015), the Eleventh Circuit found no issue with an aiding and abetting instruction with a similar defense from the defendant. There, the defendant's main defense was that "his wife committed the[] crimes." *Id.* at 851. That defense "coupled with the evidence presented at trial—that [the wife] worked where he did, that it was possible that she could have logged in remotely if she knew [the defendant's] passwords, that she was a signatory on each of the three bank accounts which received the stolen funds, and that she had a total of $17,000 in checks written out to her personally from these accounts—supported the aiding and abetting instruction." *Id.* The same reasoning applies here as similar arguments were made by Detling to blame Ingram and Cole for the charged crimes. And the supposedly distinguishing facts Detling identifies about the *Thomas* indictment do not change the law of the Eleventh Circuit, which does not require the supposed distinguishing facts Detling identifies to be present for aiding and abetting liability to apply. *See, e.g. Philpot*, 773 F. App'x at 590.

Fourth, Detling's claim of prejudice and surprise is unsupported. To start, there is no doubt that both parties knew long before trial that Cole and Ingram would be key witnesses so there was no surprise in terms of witnesses. And Detling provides no specific examples of prejudice regarding any witnesses. He at best vaguely claims that the cross-examinations of Cole and Ingram "would have been quite

31

different" (R. 170, Def. Mot. for New Trial at 13), but he does not provide a single theoretical, practical, or legal reason why his tactics would have changed. Regardless, Detling offers no reason why his strategy would be different; he would have still attacked Cole and Ingram to make it appear as if Detling was not involved, just as he did during trial. Now, having provided no specific reasons for prejudice in his opening brief, Detling has waived the ability to provide additional reasons later. *Cf. Kendricks*, 2016 U.S. Dist. LEXIS 142027, at *17–18 n.5. Moreover, the black letter law regarding aiding and abetting liability being implicit in any charged count provides all the notice needed. *See Walker*, 621 F.2d at 166.

Fifth, Detling's complaint that the "government made no reference to the instruction in closing argument" is of no moment. (R. 170, Def. Mot. for New Trial at 14.) The instruction was proper based on Eleventh Circuit law and the evidence and seemingly necessary because Detling, even now, insists on a contrived, incorrect interpretation of criminal law for which there is no legal support—that the government must exclude Cole, Ingram, and everyone else in the world from being involved in the charged scheme for the jury to convict Detling.[38] Because the jury instructions were read before closing arguments, it was important for the jury to hear the true and correct

---

[38] The actual law, of course, only requires that the elements of the offenses be proven beyond a reasonable doubt against Detling.

law to prevent defense counsel from poisoning the jury with their incorrect assertions during closing.[39]

Finally, even if the Court erred in giving the aiding and abetting instruction, any error was harmless because, as explained above, the evidence of Detling's guilty was overwhelming. *United States v. Hornaday*, 392 F.3d 1306, 1316 (11th Cir. 2004) (applying harmless error review when jury is improperly instructed on aiding and abetting theory of liability); *United States v. Grimsley*, 808 F. App'x 865, 870 (11th Cir. 2020).

\*   \*   \*   \*   \*

---

[39] The government's fears regarding Detling's closing were well-founded. During closing, the government had to take the unusual step of objecting twice due to the defense mischaracterizing the jury instructions and returning to a topic that was previously ruled off limits. (R. 165, Closing Arg. Tr. at 32:13–36:2 (Court ultimately referring the jury back to the instructions by stating "I just want to make sure that you understand, and I've said this before, but the law you are to apply is the law that's in the jury instructions. So the lawyers are arguing the law, but the law comes from what . . . I have given you as to the instructions."); *id.* at 44:13–45:3 (Court instructing defense to "move on" because the issue "was the subject of the Court's [prior] ruling on that particular matter").

**Conclusion**

For the foregoing reasons, the Court should deny Detling's motion.


Respectfully submitted,

Kurt R. Erskine
      *United States Attorney*


/s/ Alex Sistla
      *Assistant United States Attorney*
      Georgia Bar No. 845602
      Alex.Sistla@usdoj.gov


/s/ Samir Kaushal
      *Assistant United States Attorney*
      Georgia Bar No. 935285
      Samir.Kaushal@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Caitlyn Wade

Suzanne Hashimi

*Counsel for Chalmer Detling II*

January 4, 2022

/s/ ALEX SISTLA

ALEX SISTA

*Assistant United States Attorney*