IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. |
| CHALMER E. DETLING, II | 1:18-CR-309-LMM |

**United States' Sentencing Memorandum**

The United States of America, by its counsel, Kurt R. Erskine, United States
Attorney for the Northern District of Georgia, and Alex R. Sistla, Assistant
United States Attorney, files this sentencing memorandum. For the reasons
below, as well as any additional ones offered during the sentencing hearing, the
Court should: (i) conclude that the two-level victim enhancement applies under
U.S.S.G. § 2B1.1(b)(2)(A)(i); and (ii) overrule defendant Chalmer E. Detling II's
objections to the Presentence Investigation Report ("PSR"). The government
respectfully submits that Detling's advisory Guidelines range is 70-81 months.
The Court should sentence Detling to at least the top of the advisory range.[1]

---

[1] The government respectfully requests that the Court remand Detling at sentencing.
Detling made his initial appearance on August 10, 2018 and is facing a mandatory
minimum of 24 months in custody and minimum advisory sentence of nearly six years.
Detling has had ample time to settle his affairs, and the government is concerned about
him fleeing post-sentencing. The undersigned recently had another defendant who was
convicted of a child exploitation offense, and compliant on pretrial release, but failed to
report to prison as directed. His present whereabouts are unknown. More recently, in
November 2021, a white-collar defendant attempted to flee the country after being
convicted at trial in the Northern District of Georgia.

## INTRODUCTION

Even disbarred, Detling remains a threat to the public. That he isn't a violent criminal doesn't minimize the threat he poses. He's a serial fraudster. He has brazenly lied to his clients, his colleagues, his friends, the Georgia Bar, all without hesitation for years. He has even repeatedly lied under oath, like in July 2016—*after the fraud had been uncovered*—when he claimed that client money had gone to a money market account rather to Mighty.

Whenever he's been given an opportunity to tell the truth, to demonstrate even the slightest recognition of the harm he has caused or an appreciation for his criminality, Detling has failed. He has instead deflected responsibility, downplayed the harm he's caused, played semantic games, and reacted with scorn at any suggestion of misconduct. He was given a pass early in his career by the Georgia Supreme Court for dishonest behavior. But he did not learn. He's a selfish, manipulative, irredeemable person without remorse. He deserves no mercy. And the Court should show him none. A sentence of at least 81 months is necessary to provide just punishment and serves the goals of sentencing.

## ARGUMENT

### A. Probation correctly determined Detling's advisory range is 70-81 months' imprisonment.[2]

Although the Guidelines are advisory, "the district court still must [first] calculate the advisory . . . range correctly." *United States v. Angulo*, 638 F. App'x

---

[2] On January 4, 2022, the government filed its response in opposition to Detling's motion for new trial. (R. 177.). The government's response contained a lengthy background section detailing the evidence and witnesses presented during the eight-

856, 860 (11th Cir. 2016) (citing *United States v. Pugh*, 515 F.3d 1179, 1189 (11th Cir. 2008)); *see generally Gall v. United States*, 552 U.S. 38, 49 (2007).

The initial PSR determined that Detling's advisory Guidelines range for his wire fraud convictions was 37-46 months based on a Total Offense Level of 21 and Criminal History Category of I, plus a minimum two-year consecutive sentence based on his convictions for aggravated identity theft. Accordingly, the initial PSR calculated Detling's advisory range as 61-70 months' imprisonment. The parties each filed objections to the Guidelines calculations.

The government objected to Probation's failure to include the two-level victim enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i). (PSR ¶ 98.) Detling raised two objections: (i) he argued the loss amount was incorrect, claiming he was entitled to a "credit against loss" (PSR ¶¶ 21, 97); and (ii) that the abuse of trust enhancement under U.S.S.G. § 3B1.3 did not apply because he did not have an attorney—client relationship with the finance companies. (PSR ¶ 100; Jan. 13, 2022 Letter from C. Wade to A. Parker at 2.) In the final PSR, Probation agreed with the government that the two-level victim enhancement applied and rejected Detling's objections. (PSR ¶¶ 97, 98 & 100.) With the inclusion of the victim enhancement, Detling's advisory Guidelines range for his wire fraud convictions is 46-57 months and his adjusted Guidelines range (with the minimum two-year consecutive sentence for his aggravated identity theft convictions) is 70-81

---

day trial. (*Id.* at 1-13.) Given this recent filing, the significant pretrial motions practice, the detailed presentence investigation report, and the fact that the Court presided over the trial, the government presumes the Court's familiarity with Detling's fraud, the victims, and other relevant players.

months. (PSR at 34 (Part D – Sentencing Options).) Probation's calculation of Detling's advisory Guidelines range is correct.

### 1.  The two-level victim enhancement applies.

Probation correctly determined that the two-level victim enhancement applies under U.S.S.G. § 2B1.1(b)(2)(A)(i). The commentary to § 2B1.1 defines a "victim" as "any person who sustained any part of the actual loss" or "*any individual whose means of identification was used unlawfully or without authority.*" U.S.S.G. § 2B1.1, cmt. n.1, 4(E) (emphasis added). In *Simmons v. United States*, 2021 U.S. App. LEXIS 26951, at **25-26 (11th Cir. Sept. 7, 2021), the Eleventh Circuit reaffirmed that the victim enhancement may apply where a defendant uses stolen identities:

> In *United States v. Sammour*, 816 F.3d 1328, 1340 (11th Cir. 2016), this Court concluded that several individuals qualified as "victims" for purposes of § 2B1.1(b)(2) where the defendant provided the identifications of those individuals to his cohorts, who in turn used the identifications to fraudulently obtain tax refunds.

*Simmons* held that the defendant's counsel was not ineffective for not objecting to the victim enhancement because the defendant "admitted that he and his co-conspirators used the stolen PII of hundreds of people to file fraudulent claims for tax refunds and SNAP benefits." *Simmons*, 2021 U.S. App. LEXIS 26951, at **26-27; *see also United States v. Mitchell*, 728 F. App'x 953, 955, 956 (11th Cir. 2018) (affirming application of two-level victim enhancement because the defendant used unlawfully or without authorization the "means of identification"—namely the "names and PINs of AT&T customers"—to "fraudulently obtain wireless devices from AT&T wireless").

The victim-enhancement likewise applies here. The evidence at trial conclusively established that Detling used the identities of ten or more of his victim-clients to execute his scheme to defraud the financing entities.[3]

### 2. Detling has the burden of demonstrating that he is entitled to any "credit" against the loss, but even if he could, it would not affect the loss range.

Detling argues that the loss amount should be reduced because "money was returned by the defendant to the victims before the offense was detected." (Jan. 13, 2022 Letter from C. Wade to A. Parker; PSR ¶ 21.) "At a sentencing hearing, the defendant has the burden of showing by a preponderance of the evidence that she is entitled to a reduction in the loss calculation." *United States v. Boyce*, 759 F. App'x 259, 266 & n.34 (5th Cir. 2019) (citing *United States v. Mahmood*, 820 F.3d 177, 194 (5th Cir. 2016)).[4]

---

[3] *See, e.g.*, R. 154, Verdict Form at 2 (jury's guilty verdicts on aggravated identity charges, Counts 11-15); GX-445 (government's summary exhibit); testimony from the twelve victim-clients at trial (B.C., W.G., K.J., M.S.K., S.L. (on behalf of himself and W.L.), D.M. (on behalf of T.M.), V.M., H.M., B.P., K.P., A.U., L.W.)

[4] *See also United States v. Kraus*, 656 F. App'x 736, 741 (6th Cir. 2016) ("the defendant has the burden of providing specific [fair market] value by which the loss amount should be reduced") (quoting *United States v. Reid*, 764 F.3d 528, 534 (6th Cir. 2014)) (alteration in original); *United States v. Hammer*, 3 F.3d 266, 272 (8th Cir. 1993) ("The burden of proof [at sentencing] is on the government with respect to the base offense level and any enhancing factors. The burden of proof is on the defendant with respect to mitigating factors."); *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990) ("[T]he government should bear the burden of proof when it seeks to raise the offense level and . . . the defendant should bear the burden of proof when the defendant seeks to lower the offense level.").

Under the Guidelines, a defendant is entitled to a "credit" against the loss if, among other reasons, "[t]he money was returned . . . *by the defendant* or other persons acting jointly with the defendant[] to the victim *before the offense was detected*." U.S.S.G. § 2B1.1 cmt. n.3(E)(i) (emphasis added). "The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.* Detling isn't entitled to a credit simply because a victim received some of its money back. Rather, he had to be responsible for returning the money, and he had to do so before the detection of the fraud. *See, e.g.*, *United States v. Nixon*, 465 F. App'x 912, 921 (11th Cir. 2012).

Detling has thus far identified a single transaction for which he claims he should receive credit—a $27,500 wire he sent on or about January 21, 2015 to Mighty as repayment for a fraudulently obtained litigation advance in R.J.'s and H.J.'s names. (Jan. 13, 2022 Letter from C. Wade to A. Parker; PSR ¶ 21.)[5] Although crediting this amount would have no impact on Detling's advisory Guidelines range,[6] the Court should nevertheless decline to credit this transaction because "courts have held that a fraudster may not receive credit for value that is provided to his victims for the sole purpose of enabling him to

---

[5] Detling states that he "intend[s] to provide additional records prior to sentencing to reflect the total credits to which [he's] entitled." (Jan. 13, 2022 Letter from C. Wade to A. Parker.) The government will address at sentencing any specific credits that Detling seeks.

[6] The applicable loss range of $250,000 to $550,000 would remain unchanged regardless of whether Detling receives credit for this wire.

conceal or perpetuate his scheme[.]" *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (citing *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996); *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998)). Detling sent this wire, at least in part, to help conceal his scheme. By making this sizeable payment, it made it less likely that Mighty would carefully probe or scrutinize other advances that it made to Detling. Indeed, after making this payment, Detling applied for and obtained more than two dozen additional fraudulent advances before his scheme unraveled. Detling should thus not receive credit for the occasional payments he made during the scheme because they were designed to lull Mighty (and his other victims) into a sense of complacency.

If the Court concludes otherwise, however, the government respectfully submits that Detling—at the latest—"knew or reasonably knew that [his] offense was . . . about to be detected by a victim" by the beginning of March 2016. U.S.S.G. § 2B1.1 cmt. n.3(E)(i)(II). On March 16, 2016, after several weeks of email exchanges with Josh Schwadron on the status of Mighty's outstanding liens (in which Detling was clearly stalling for time),[7] he falsely claimed:

> As you know we've settled some cases with outstanding client advances that were never paid. I won't get into the how and why other than to say it's been handled. . . . I've segregated the funds for

---

[7] *See* GX-271 (Mar. 2, 20216 email from J. Schwadron to C. Detling checking on status of M. Jones case); GX-272 (Mar. 3 2016 email from C. Detling to J. Schwadron in which Detling falsely accuses M. Cole of financial mismanagement), GX-273 (Mar. 9, 2016 email exchange between C. Detling and J. Schwadron re: lien status); GX-274 (Mar. 14, 2016 email from C. Detling to J. Schwadron acknowledging he owes information); GX-275 (Mar. 16, 2016 email from C. Detling to J. Schwadron acknowledging he owes Schwadron an email, but falsely stating there are "[n]o issues").

each of these clients and will be making payments as I get consent from the clients."[8]

None of this made sense (let alone was true) as Schwadron recognized in his response barely twenty minutes later:

The client's [sic] have already given consent, maybe twice. . . . Why do you need another permission on top of it? . . . Please let me know ASAP so I can let our investors know what's going on."[9]

Indeed, on March 21, 2016, Schwadron emailed Detling:

It's been 5 days and I still haven't heard back from you. It's been about 3 weeks since we spoke on the phone last, despite numerous unreturned calls to your office and cell. I really need clarity on what's going on. I am waiting on a few payments and need updates generally on everything.[10]

And over the next six weeks, Schwadron and Detling would continue to have similar exchanges, until finally on May 3, 2016, Schwadron emailed Detling:

I got a call from the GA Bar telling me they got an anonymous tip that some cases funded with your clients have settled and we've been paid. I've tried calling your office but I have not heard back from you.

The bar gave me a lawyer who they say is representing you. I need to talk to someone ASAP to get an understanding of what's going on. Are you planning on calling me back or would you prefer if I speak to the lawyer the bar game me?[11]

---

[8] GX-276 (Mar. 16, 2016 email from C. Detling to J. Schwadron).

[9] *Id.* (Mar. 16, 2016 email from J. Schwadron to C. Detling).

[10] *Id.* (Mar. 21, 2016 email from J. Schwadron to C. Detling).

[11] GX-283 (May 3, 2016 email from J. Schwadron to C. Detling).

Detling acknowledged the next morning that he had counsel[12] and over the next year made occasional payments to Mighty.[13]

Even though the Georgia Bar did not alert Mighty of Detling's fraud until May 3, 2016, the relevant question under the application note is when *Detling* knew or should've reasonably known the fraud was about to be detected. U.S.S.G. § 2B1.1 cmt. n.3(E)(i)(II). It is evident from these emails—and Schwadron's trial testimony—that Detling recognized Mighty was becoming more aggressive about seeking repayment and he was merely stalling to keep them from discovering the fraud. This is especially true once Mighty contacted Aimee Ingram about the status of the litigation advances. It was reasonably foreseeable that his fraud would be uncovered because she knew nothing about any of these advances.[14] Ingram testified at trial that she requested copies of the financing agreements from Mighty—a fact confirmed by the email correspondence[15]—and after determining none of the clients had authorized the advances confronted Detling in approximately mid- to late April 2016 (before notifying the Georgia Bar about the fraud on or about May 2, 2016).[16] *Cf. United States v. Rhodes*, 410 F. App'x 856, 862 (6th Cir. 2015) (observing that when a

---

[12] *Id.* (May 4, 2016 email from C. Detling to J. Schwadron).

[13] *See, e.g.*, GX-288.

[14] *See* GX-277 (Mar. 21, 2016 email from W. Gibbons to A. Ingram).

[15] *See, e.g.*, GX-277 (Mar. 21, 2016 email exchanges between A. Ingram and W. Gibbons).

[16] Ex. A, GX-365 (redacted for victims' names). At trial, a redacted version of GX-365 was introduced into evidence.

defendant knew or should have reasonably known his fraud was about to be detected when advised his books were going to be audited).

Detling also should have reasonably known that his fraud was about to be detected in early March 2016 because this was not the first time he faced direct questions from a financing company about the status of repayment. In January 2015, Detling fraudulently obtained four litigation advances from Peak Funding Group ("Peak") totaling approximately $22,500, including in the name of victim-client T.M.[17] As in the case of the fraudulent Mighty and Capital Financing advances, Detling obtained these advances without the clients' knowledge or permission. In late January 2015, after the advances had gone out, Peak attempted to contact the clients who had allegedly sought the advances. These efforts were mostly unsuccessful.[18] By February 9, 2015, however, Peak advised Detling and his counsel:

> I left you a message earlier regarding Mr. Detling's fraudulent actions.

---

[17] This conduct was not charged in the Indictment, but D.M. testified regarding fraudulent advances obtained in T.M.'s name at trial from Mighty. T.M. testified that they never sought any litigation advances but *expressly* told Detling they did not want any. The government is providing counsel and the Court correspondence it received from Peak Funding on February 2, 2022 regarding these fraudulent advances. *See* Ex. B, C, D. These advances were, however, reflected in bank statements previously provided to Detling. *See* Ex. E (wire slip for Jan. 9, 2015 transfer from Peak); Ex. F (wire slip for Jan. 15, 2015 transfer from Peak); Ex. G (wire slip for Jan. 22, 2015 transfer from Peak); Ex. H (wire slip for Jan. 23, 2015 transfer from Peak). Peak's total funding was $24,750 but only $22,500 was sent to Detling because Peak deducted application and processing fees from the advances. *See* Ex. J (Jan. 9, 2015 Peak Funding Purchase Agreement for J.P. at 1).

[18] Ex. B (summary chart prepared by M. Omni on attempted contacts)

We funded 4 of Mr. Detling's clients in January for a total of $24,750.00.

**The payoff on these funding's [sic] total $29,700 which is due immediately.**

A curtsey [sic] call to clients revealed the following:

We have confirmed that 1 of these clients never asked for a pre settlement funding, hasn't received the $7,500 we funded into Mr. Detling['s] account for this client, and never signed anything from our office[.] [S]he furthermore knew nothing about an email address we sent the funding agreement too [sic]. . . .

We have asked Mr. Detling to provide us valid contact phone numbers for the other 3 clients we supposedly funded but have only received false numbers.

  --Detling or someone in his office falsely signed funding agreements in the names of his clients and have also set up fake email addresses to capture the agreements and sign them.

  --Not only will Mr. Detling lose his Bar card once these facts are revealed but we will be pursuing criminal charges against Mr. Detling shortly.

I urge you to talk to your client and payoff the funding total immediately.[19]

---

[19] *See* Ex. C (Feb. 9, 2015 email from R. Rescigno to D. Ivey & C. Detling) (bolding in original). A review of the bank records and Detling's correspondence with Mighty suggests that he used the advances he fraudulently received from Peak to make a payment to Mighty. That Detling would steal money to help conceal a fraud is hardly surprising. At trial, the government showed that Detling stole $17,500 of client money to make a payment to Mighty in March 2016. (GX-317 ($25,000 check from GEICO payable to J.O.)); GX-318 (wire slip from SunTrust Account x0526 $17,500 transaction); GX-279 (email from Apr. 1, 2016 email from J. Schwadron to C. Detling re payment).) He then lied under oath in a Georgia Bar disciplinary proceeding about having done so,

That same day, February 9th, Detling's attorney replied that Detling would wire the funds the next day, February 10, 2015. Detling failed to do so, but wired the finds on February 12th when he also sent the following email to Peak::

> David forwarded your email to me. The wire went through this afternoon. For future reference, your routing number is 121000248 not 061000227, which is you ACH number. Hence the delay.
>
> **Please let the sheriff know that I will be in Disney World next week but that I am available for arrest the week of the 23rd.**[20]

Although there's no indication that Detling attempted to defraud Peak again, he knew (or should have known) that if Mighty were to begin probing more aggressively into the status of the advances — as they began to do so in March 2016 — they would discover his fraud. Accordingly, the Court should — at a minimum — not credit Detling with any funds he sent to Mighty after Schwadron began to probe him more aggressively on the status of the advances.

   In the event the Court disagrees with the foregoing, the government submits that Detling should not receive any credit against loss after May 3, 2016 when the Georgia Bar notified Schwadron about the potential fraud. *See, e.g.*, *United States v. Jones*, 199 F. App'x 812, 817 (11th Cir. 2006) (affirming district court's conclusion that the defendant should not receive credit for returning a fraudulently obtained vehicle until after the offense was detected); *United States*

---

falsely testifying that he wired J.O.'s funds to money market account. (GX-389 (excerpt of C. Detling's testimony)).

   [20] Ex. D (Feb. 12, 2015 email from C. Detling to D. Ivey & R. Rescigno) (bold added); Ex. H (wire slip for Feb. 12, 2015 wire from C. Detling to Peak).

*v. Philpot*, 733 F.3d 734, 749 (7th Cir. 2013) (no credit after the "media had already reported" on wrongdoing because the defendant "should have known that government investigators might soon become aware of his conduct"). If the Court credits Detling with any "repayments" before May 3, 2016, the government does not believe it would impact the advisory range, *i.e.*, the loss range would remain $250,000 to $550,000.

### 3. The abuse of trust enhancement applies.

The PSR correctly found that the two-level abuse of trust enhancement applies under U.S.S.G. § 3B1.3. The two-level enhancement may apply if a defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *Id.* Courts typically apply the enhancement in circumstances where the defendant occupies a position of professional or managerial discretion and relies upon that discretion in order to "facilitate the commission or concealment of the offense." *Id.*, cmt. n.1.

For the adjustment to apply under § 3B1.3's "abuse of trust" prong, the government must show that the "defendant has abused discretionary authority entrusted to the defendant by the victim." *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008) (quotations omitted).[21] But because "there is a component of misplaced trust inherent in the concept of fraud . . . a sentencing court must be

---

[21] As discussed below, a two-level enhancement under § 3B1.3 may also apply if: (i) a defendant unlawfully (or without authority) uses any means of identification to commit the offense; or (ii) his special skills to significantly facilitate or conceal the offense.

careful not to be 'overly broad' in imposing the abuse-of-trust enhancement or 'the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise, would receive a § 3B1.3 enhancement.'" *United States v. Etienne*, 772 F. App'x 795, 798 (11th Cir. 2019) (quoting *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010)). Accordingly, "in the fraud context, § 3B1.3 has been recognized to apply . . . where the defendant is in a fiduciary, or other personal trust relationship to the victim of the fraud, and the defendant takes advantage of the relationship to perpetrate or conceal the offense." *Etienne*, 772 F. App'x at 798 (citation omitted). In other words, "there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." *Ghertler*, 605 F.3d at 1264 (citation omitted).

Here, "a special trust" existed between Detling and victim financing companies. With respect to both Mighty and Capital Financing, Detling developed more than an "arm's-length relationship." Dr. Golden of Capital Financing testified that he was friends with Detling and that explained, at least in part, why Capital Financing did not directly contact Detling's clients to confirm whether they had received the litigation advances. Their friendship also explains why Detling was able to conceal the fraud from Capital Financing until May 2016. Likewise, Schwadron and Hugh Brammer testified that Detling developed a friendly rapport with them. Detling met them in New York for dinner; Detling sent Brammer wine; and Detling and his wife met Schwadron for dinner in Atlanta. Their email exchanges reflected a friendly banter, rather than strictly a

business relationship. Detling took special advantage of the fact that Mighty did not directly contact plaintiffs who sought litigation financing but relied upon the representations of their lawyers. Detling also showed a special interest in Mighty by "investing" in cases with them.

The victim financing companies trusted Detling to provide accurate information about his *clients'* financial status, their cases, and desire to obtain high-interest litigation financing. In essence, they relied on Detling's professional judgment, discretion, and deference in recommending (and assisting) his clients to seek financing that was to be obtained only as a last resort. *See, e.g.*, *United States v. Smith*, 853 F. App'x 589, 594-95 (11th Cir. 2021) (affirming § 3B1.3 enhancement where the defendant's business had a purported ownership interest in victim-lender and where the victim lender "trusted their financial partner to provide accurate information" about the defendant's business).

In the alternative, the abuse of trust of enhancement also applies when "[a] defendant exceeds or abuses the authority of . . . her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification." *Id.*, cmt. n.2(B). A "means of identification" includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(7); *see also* U.S.S.G. § 3B1.3, cmt. n.2(B) (means of identification has same meaning as used in § 1028(d)(7)).

It is undisputed that Detling used the identities of others, namely that of dozens of his clients to facilitate the scheme. In *United States v. Cruz*, 713 F.3d 600, 608-09 (11th Cir. 2013), the court of appeals, relying on Application Note 2(B),

affirmed imposition of the abuse of trust enhancement for a Target cashier who processed stolen credit cards to acquire merchandise on behalf of her co-conspirators despite the fact she held no supervisory or managerial position. *Cruz* followed *United States v. Abdelshafi*, 592 F.3d 602, 611 (4th Cir. 2010), which affirmed the abuse-of-trust enhancement based on Application Note 2(B) for a defendant who abused his position by using, without authority, Medicaid patients' identifying information to file fraudulent claims for payment. Detling's actions are analogous. The two-level abuse of trust enhancement applies because Detling used, without authorization, his clients' identities to fraudulently obtain litigation advances from the financing companies. *See also Smith*, 853 F. App'x at 595 (holding in the alternative that "the district court properly applied the two-level abuse-of-trust enhancement under our precedent establishing the means-of-identification rationale for such enhancement" [because] the defendant "used names and signatures that he obtained through his role at Smith Advertising to commit and conceal his fraud.") (citing *Cruz*); *Siler v. United States*, No. 17-cv-24294, 2019 U.S. Dist. LEXIS 78683, at **35-36 (S.D. Fla. May 8, 2019) ("existence of a fiduciary relationship between [defendant] and [victim] . . . was not required for application of the abuse-of-trust enhancement" based on Application Note 2(B)) (citing *Cruz* and *Abdelshafi*).

The abuse of trust enhancement also applies because Detling used a "special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Application Note 4 identifies lawyers as among those individuals who possess "special skills"—namely skills "not possessed by

16

members of the general public and usually requiring substantial education, training or licensing." *Id.* cmt. n.4. The Eleventh Circuit has explained, however, that a defendant's "status as an attorney . . . does not necessarily mean he abused a position of trust." *United States v. Morris*, 286 F.3d 1291, 1297 (11th Cir. 2002). As such, "it is simply not the case that an attorney holds a position of trust with respect to all people with whom he comes into contact solely by virtue of his status as an attorney." *Id.*

The evidence at trial demonstrated that Detling used his training and experience as a personal injury attorney to significantly facilitate the fraud. His experience was in fact essential to executing the fraud. In the first place, the litigation financing companies would never have dealt with Detling if he wasn't a personal injury attorney. *See, e.g.*, *United States v. Tai*, 750 F.3d 309, 318 (3d Cir. 2014) (§ 3B1.3 enhancement applies where "highly trained doctor" used his "skill and credentials [as] the means by which he could participate in the claims process" through which he executed the fraud). That aside, Detling was able to successfully execute his scheme because he was an experienced personal injury lawyer, well-versed in the relevant law.[22] *See, e.g.*, *United States v. Grant*, 479 F. App'x 904, 906 (11th Cir. 2012) ("A special skill does not require formal education, and 'may be obtained through life experience and self-study[.]'") (citations omitted). Because of his specialized training and experience, Detling knew of and had access to the type of information—police and medical reports,

---

[22] For example, Detling stated that one of specialties was dental malpractice. *See* GX-212 (August 31, 2015 email from C. Detling to H. Brammer).

insurance coverage, typical recoveries in Georgia—that the financing companies required to properly evaluate an injured party's potential recovery.[23] Having access or obtaining this information could only be accomplished by someone with specialized skills, including knowledge of how to file complaints, interface with insurance companies, send demand letters, take depositions, subpoena documents, find experts, go to trial, *etc.* Indeed, it was sometimes necessary that Detling took one or more of these steps to obtain or develop the information necessary to send to the financing companies

The voluminous email exchanges presented at trial, as well as Schwadron's and Hugh Brammer's testimony, conclusively established that they relied—in large part—on Detling's representations and overall assessment of his cases. They were able to do so because Detling knew and understood what was relevant to the financing companies by virtue of his specialized training and experience as personal injury attorney. *See, e.g.*, *United States v. Kyereme*, 371 F. App'x 292, 294 (3d Cir. 2010). And therefore the enhancement applies. *See Grant*, 479 F. App'x at 906 (applying § 3B1.3 enhancement based on the defendant's special skills where "the evidence . . . [showed] that [the defendant] gained detailed knowledge of loan-application and loan-processing procedures during the three years he worked as a loan officer or mortgage broker before committing

---

[23] *See, e.g.*, GX-191 (November 10, 2014 email exchanges between C. Detling and J. Schwadron and C. Detling and J. Schwadron regarding potential dental malpractice case); GX-208 (April 13-14, 2015 exchanges between C. Detling and H. Brammer about K.P.'s case, including substantive discussion regarding contributory negligence and right-of-way drivers).

mortgage fraud"); *United States v. Azmat*, 805 F.3d 1018, n.9 (11th Cir. 2015) (noting that a defendant who was a physician received two-level increase for either abusing a position of trust or using special skills because he "was a licensed medical doctor authorized to issue prescriptions for controlled substances"); *see also, e.g., United States v. Calabrese*, 660 F. App'x 97, 99-101 (2d Cir. 2016) (affirming § 3B1.3 enhancement for experienced mortgage broker whose experience helped to both facilitate and conceal a mortgage fraud conspiracy); *United States v. Ojemen*, 465 F. App'x 69, 71 (2d Cir. 2012) (special skills enhancement applied where the defendant was the company's controller and "possessed a financial sophistication beyond that of the general public, which he used to facilitate his production of the myriad forged and fraudulent financial and tax documents necessary to his criminal scheme"); *United States v. Stalnaker*, 571 F.3d 428, 441 (5th Cir. 2009) (holding defendant attorney performing mortgage closing possessed special skill warranting enhancement for convictions arising out of mortgage fraud); *United States v. Downing*, 297 F.3d 52, 65 (2d Cir. 2002) (finding no error in application of special skill enhancement where defendants used accounting training for purpose of producing fraudulent audit reports).[24]

---

[24] If the Court concludes that the § 3B1.3 enhancement applies because Detling used his special skills as an attorney to significantly facilitate his fraud, it is immaterial whether he occupied a position of trust vis-à-vis the victim-financing companies.

**B. The Court should sentence Detling to at least 81 months' imprisonment.**

After properly calculating a defendant's advisory Guidelines range, the court must consider the Section 3553(a) factors,[25] and impose "a sentence sufficient but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from future criminal conduct. 18 U.S.C. § 3553(a)(2)(A)-(D). "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." (citing *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007)). The Eleventh Circuit, however, does "not require a district court to state on the record that it has explicitly considered each of the § 3553(a) factors." *United States v. McKleroy*, 783 F. App'x 878, 879 (11th Cir. 2019) (citing *United States v. Dorman*, 488 F.3d 936, 938 (11th Cir. 2007)). It is sufficient that a district court acknowledge having considered the defendant's arguments and the § 3553(a) factors. *See, e.g.*, *id.* In other words, the district court "should set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision-making authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).[26]

_____

[25] The familiar § 3553(a) factors include: (i) the nature and circumstances of the offense (§ 3553(a)(1)); (ii) the history and characteristics of the defendant (§ 3553(a)(1)); (iii) the need for the sentence imposed to reflect the seriousness of the offense (§ 3553(a)(2)(A)); (iv) deterrence of criminal conduct (§ 3553(a)(2)(B)); (v) the need to protect the public from future crimes (§ 3553(a)(2)(C)); (vi) the kinds of sentences available (§ 3553(a)(3)); (vii) the advisory guidelines range (§ 3553(a)(4)(A)); (viii) the need to avoid unwarranted sentencing disparities (§ 3553(a)(6)); and (ix) the need to provide restitution of any victims of the offense (§ 3553(a)(7)). 18 U.S.C. § 3553(a)(1)-(7).

[26] The present memorandum briefly highlights the § 3553(a) factors that the government believes are most relevant in determining Detling's sentence. The

1.  **The nature and circumstances of Detling's offense warrant a sentence at the top of the Guidelines (18 U.S.C. § 3553(a)(1))**

The seriousness of Detling's crimes cannot be overstated. While the Court is intimately familiar with these facts, they bear repeating. As a then-licensed attorney, Detling abused the trust of his clients and the financing companies for nearly eighteen months. His clients came to him because they had been injured--- sometimes horrifically so like in the case of T.M.—and Detling took advantage of them. He didn't apply for one or two fraudulent advances. He didn't defraud the financing companies of a few thousand dollars. He didn't use a couple of identities. No. Detling used the identities of virtually every one of his clients. In some instances, he used the same client's name to obtain multiple fraudulent advances. He applied for and obtained approximately fifty fraudulent advances during the scheme. And as result, the financing companies lost hundreds of thousands of dollars.

2.  **Detling's history and characteristics weigh in favor of a sentence at least at the top of the Guidelines. (18 U.S.C. § 3553(a)(1))**

Detling's history and characteristics also favor a sentence at least at the top of the Guidelines. Any person who has demonstrated the capacity to lie and deflect in the manner that Detling has deserves significant punishment. Any person who can take advantage of family, friends, even a kid they once coached deserves significant punishment. Any person who can take advantage of those who come in a time of need deserves significant punishment. And any person who would

---

government will discuss these, and—if necessary—the remaining factors at the sentencing in more detail in support of its recommended sentence.

use their own child's illness to minimize their own wrongdoing deserves significant punishment. That is who Detling is. He is an unrepentant liar who cares only for himself. A man who stole client funds to make a payment to Mighty. A man who exploited his own child's illness when it suited him--- repeatedly using it as an excuse for his own incredibly dishonest conduct. A man willing to blame everyone else for his own misdeeds. But it is not only the government who sees Detling for who he is. In November 2013, *before* he began defrauding the financing companies, a lawyer representing one of Detling's former clients sent this to Detling:[27]

> Dear Mr. Detling:
>
> I am in receipt of your letter of yesterday concerning the lack of insurance and your proposal to resolve this matter. Your proposal is flatly rejected.
>
> In reviewing the facts of the case, all of the emails and texts, the case files delivered to Paller & Creasy (which apparently included private health information of another client), and your response to Mr. Rahman's Grievance filed with the State Bar, I have come to the conclusion that never in my sixteen years of practice have I seen a more clear-cut case of intentional misconduct and malfeasance by an attorney. Your actions are only aggravated by the extreme lengths to which you went to create documentation to refute my client's valid allegations and then went on to baselessly and cruelly defame him in your response to the State Bar. The expert witness on negligence being retained in this matter shares a very similar opinion. I am also prepared to retain a handwriting expert as to the signature on the $7,000.00 check and the "second" retainer agreement - although it is my sincere hope you will not force my client to go to such extremes.
>
> My client has suffered egregiously in this matter. Not only did he lose the last money he had available to him, but also he was prevented from entering into another

---

[27] The full letter is attached as Ex. O (November 21, 2013 Letter from C. Berney, Esq. to C. Detling).

> purchase due to your inexplicable failure to return my client's funds to him. Your actions have caused considerable financial and emotional damage to my client and his immediate family.

Detling has always been the same dishonest man. He's just now being held accountable.

### 3. A sentence at the high-end of the Guidelines is necessary to promote general and specific deterrence. (18 U.S.C. § 3553(a)(2)(B))

Finally, a sentence of at least 81 months is necessary to promote specific and general deterrence.

*Specific Deterrence*. It is difficult to imagine another defendant without any criminal history where there is such a pressing need for specific deterrence. Detling didn't just defraud the financing companies. He fabricated documents. He stole his clients' identities. He's stole client money. He's lied to his friends, employees, clients, and even under oath. His fraud and deception weren't isolated. It continued for years, and even when exposed he continued to lie, to deflect, to blame---to not accept responsibility for his actions. What makes Detling's behavior even more contemptuous is that he had already been given a second chance by the Georgia Supreme Court.

In 2011, several years before he began defrauding the financing companies, the Georgia Supreme Court reprimanded Detling for failing to make a material disclosure in the connection with a commercial transaction.[28] The Georgia

---

[28] *In re: Chalmer E. Detling, II*, No. S11Y1007 (May 31, 2011), *available at* https://caselaw.findlaw.com/ga-supreme-court/1569212.html (attached as Ex. K).

Supreme Court approved of a "Review Panel reprimand" because Detling allegedly had a good reputation, was a mentor, supposedly performed significant *pro bono* work, and was active in the community.[29] Detling proved unworthy of the Supreme Court's trust.

Within just a few years, he was not only stealing his clients' identities and defrauding the financing companies but again under investigation by the Georgia Bar for various malfeasance — this time for allegedly misusing client funds and settling cases without their authority.[30] Remarkably, Detling began stealing his clients' identities and defrauding the financing companies after those investigations had already begun.[31] Indeed, Detling obtained dozens of fraudulent litigation advances in 2015 *while subject to three simultaneous investigations by the Georgia Bar*.

Detling was afforded leniency once by the Supreme Court of Georgia. He was able to settle with the SEC without admitting wrongdoing. (PSR ¶ 142.) But

---

[29] *See id.*

[30] *See* Ex. L (*In the Matter of Chalmer E. Detling, II*, Report and Recommendation of Special Master Docket 6640 – filed Aug. 22, 2016), Ex. M (*In the Matter of Chalmer E. Detling, II*, Report and Recommendation of Special Master Docket 6672 – filed Aug. 22, 2016), Ex. N (*In the Matter of Chalmer E. Detling, II*, Report and Recommendation of Special Master Docket 6804 – filed Aug. 22, 2016.). The Special Master reports are very detailed, but in essence he concluded that Detling had in fact committed numerous ethical violations relating to the management of his clients' funds. The government expects to discuss these findings in more detail at sentencing because they reflect not only on the need for the sentence to provide specific deterrence but provide a keen insight into Detling's history and characteristics.

[31] *See, e.g.,* Ex. L (noting that a grievance against Detling was filed October 2, 2013, the Investigative Panel made a probable cause finding on September 26, 2014, and the Georgia Bar filed a formal complaint on December 19, 2014).

Detling showed little appreciation for his good fortune. A substantial custodial sentence—at least at the high end of the advisory Guidelines range—is necessary to deter Detling from future criminal conduct.

*General Deterrence*. Most white-collar offenses are the product of thoughtful, careful deliberation. Their typically prolonged nature often presents a defendant with ample opportunities to cease his or her conduct. That was certainly the case here – the fraud scheme lasted approximately eighteen months, and there was nothing preventing Detling from stopping. A meaningful custodial sentence—at least at the top of the advisory Guidelines range—is therefore necessary to deter other would-be white-collar offenders, especially professionals like Detling who occupy positions of significant trust where they are expected—at a minimum—to hold in confidence the personal identifying information of their clients. This is even more so here, give the deliberate and calculating nature of his offenses.

As the Eleventh Circuit has observed, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these [offenses] are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227 1241 (11th Cir. 2006).  Phrased differently, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id*. Where a court declines to impose a significant sentence upon a white-collar offender, "the message . . . is [sent] that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." Id. Indeed, even if an individual defendant

himself poses little danger of re-offending, she should not receive a minimal sentence; "such a sentence" would be "grossly inappropriate" where, as here, a [substantial] term of imprisonment will "carry[] substantial deterrent or punitive impact." *Id.* And who would possibly be deterred from stealing the identifies of dozens of clients and defrauding financing companies of hundreds of thousands of dollars, if those like Detling—highly trained professionals—did not receive a substantial prison sentence? Few, if any.

## Conclusion

For the foregoing reasons, the government respectfully requests that the Court sentence Detling to at least 81 months' imprisonment. Nothing less would appropriately serve the goals of sentencing, especially where he engaged in this rampant criminal conduct while being investigated by the State Bar of Georgia. Any lesser sentence would neither promote respect for the law nor provide just punishment.

Respectfully submitted this 3rd day of February 2022.

KURT R. ERSKINE
*United States Attorney*


/s/ ALEX R. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602
alex.sistla@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

February 3, 2022

/s/ ALEX R. SISTLA

ALEX R. SISTLA

*Assistant United States Attorney*